John REEVES, Appellant,

v.

ALYESKA PIPELINE SERVICE
COMPANY, Appellee.

No. S–6527.

Supreme Court of Alaska.

Nov. 22, 1996.

Thomas V. Van Flein, Law Office of Thomas V. Van Flein, Beverly Hills, California, and David H. Call, Call, Barrett & Burbank, Fairbanks, for Appellant.

Lawrence R. Trotter and Mindy R. Kornberg, Alyeska Pipeline Service Company, and Sally J. Kucko, Groh, Eggers & Price, Anchorage, for Appellee.

Before RABINOWITZ, MATTHEWS and COMPTON, JJ.

*OPINION*

PER CURIAM.

## I. *INTRODUCTION*

This case raises issues concerning the protection of ideas. It arises out of John Reeves' claims that in 1991 Alyeska Pipeline Service Company (Alyeska) appropriated his idea for a visitor center at a popular turnout overlooking the Trans–Alaska Pipeline. The superior court granted summary judgment to Alyeska. We reverse in part and remand for further proceedings.

## II. *FACTS AND PROCEEDINGS*

In 1985 Alyeska created a visitor turnout at Mile 9 of the Steese Highway between Fox and Fairbanks.[1] The turnout had informational signs and provided visitors a view of the Trans–Alaska Pipeline. Before Alyeska constructed the turnout, visitors gained access to the pipeline by a nearby road and trespassed on the Trans–Alaska Pipeline right-of-way.

John Reeves, owner of Gold Dredge No. 8, a tourist attraction outside Fairbanks and near the turnout, contacted Alyeska in January 1991 to discuss a tourism idea he had. He spoke with Keith Burke, Alyeska's Fairbanks Manager. After receiving Burke's assurance that the tourism idea was "between us," Reeves orally disclosed his idea to build a visitor center at the turnout. He proposed that Alyeska lease him the land and he build the center, sell Alyeska merchandise, and display a "pig"[2] and a cross-section of pipe.

Burke told him the idea "look[ed] good" and asked Reeves to submit a written proposal, which Reeves did two days later. The proposal explained Reeves' idea of operating a visitor center on land leased to him by Alyeska. The proposal included plans to provide small tours, display a "pig," pipe

---

1. Since Reeves is appealing the grant of Alyeska's motion for summary judgment, we describe the facts in the light most favorable to Reeves. *Willner's Fuel Distrib., Inc. v. Noreen,* 882 P.2d 399, 403 n. 7 (Alaska 1994).

2. A "pig" is a device which passes through the pipeline to clean interior pipe walls, survey interior pipe shape and detect corrosion.

valve, and section of pipe, sell refreshments and pipeline memorabilia, and plant corn and cabbage.

After submitting the proposal, Reeves met with Burke once again. At this meeting Burke told Reeves the proposal looked good and was exactly what he wanted. In Reeves' words, Burke told him, "We're going to do this deal, and I'm going to have my Anchorage lawyers draw it." Reeves claimed he and Burke envisioned that the visitor center would be operating by the 1991 summer tourist season.

Reeves alleges that Alyeska agreed during this meeting (1) to grant access to the turnout for twenty years; (2) to allow Reeves to construct and operate an information center; and (3) to allow Reeves to sell merchandise and charge a $2.00 admission fee. Reeves stated that, in exchange, he agreed to pay Alyeska ten percent of gross receipts.

Over the next several months, Burke allegedly told Reeves that the deal was "looking good" and not to worry because it takes time for a large corporation to move. However, in spring 1991, Burke told Reeves that the visitor center was such a good idea that Alyeska was going to implement it without Reeves. By August 1991 Alyeska had installed a portable building at the turnout to serve as a visitor center; it built a permanent log cabin structure in 1992.

The members of the Alyeska Pipeline Club North (APCN) operated the visitor center and sold T-shirts, hats, and other items.[3] APCN does not charge admission. A section of pipeline and a "pig" are on display. APCN employees provide information and answer visitors' questions. Members of APCN had suggested in 1987 that Alyeska create a visitor center at the turnout. However, Alyeska had rejected the idea at that time. Before meeting with Reeves, Burke did not know that APCN's visitor center idea had been raised and rejected by Alyeska in 1987.

Approximately 100,000 people visited the visitor center each summer in 1992 and 1993. It grossed over $50,000 in sales each year.

The net profit for 1993 was calculated to be $5,000–$15,000. APCN received all the profit.

Reeves filed suit in May 1993. By amended complaint, he alleged a variety of tort and contract claims. Judge Charles R. Pengilly granted Alyeska's motion for summary judgment on all claims; Reeves appeals. Reeves also appeals the superior court's denial of Reeves' motion to compel production of Burke's daily calendar.

### III. DISCUSSION

 We will review a grant of summary judgment *de novo* and will adopt the rule of law that is most persuasive in light of precedent, reason, and policy. *Department of Health and Social Serv. v. Alaska State Hosp. and Nursing Home Ass'n*, 856 P.2d 755, 759–60 (Alaska 1993); *Guin v. Ha*, 591 P.2d 1281, 1284 (Alaska 1979). We are not bound by the trial court's reasoning and may affirm a grant of summary judgment on any alternative ground appearing in the record. *Far North Sanitation, Inc. v. Alaska Pub. Util. Comm'n*, 825 P.2d 867, 869 n. 2 (Alaska 1992). To succeed on summary judgment a movant must show that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. *Zeman v. Lufthansa German Airlines*, 699 P.2d 1274, 1280 (Alaska 1985). In determining whether there is a genuine issue of material fact, all "reasonable inferences of fact from proffered materials must be drawn against the moving party ... and in favor of the non moving party." *Kiester v. Humana Hosp. Alaska, Inc.*, 843 P.2d 1219, 1222 (Alaska 1992) (quoting *Sea Lion Corp. v. Air Logistics of Alaska*, 787 P.2d 109, 116 (Alaska 1990)).

Reeves sued Alyeska on claims of breach of oral contract, promissory estoppel, breach of implied contract, quasi-contract (unjust enrichment and quantum meruit), breach of the covenant of good faith and fair dealing, breach of license and/or lease agreement, and various torts related to the contractual relationships alleged.

---

3. Alyeska Pipeline Club North is a non-profit corporation run by Alyeska employees. It raises money to fund activities such as picnics and Christmas parties for Alyeska employees.

This case presents several questions of first impression concerning the protection of business ideas. Reeves claims that Alyeska contracted for both the disclosure and use of his idea. Alyeska maintains that Reeves' "idea" was not novel or original and that an Alyeska employee had proposed an identical idea in 1987. Therefore, Alyeska argues that most of Reeves' claims fail because his idea was not novel or original. Alyeska also argues that Reeves' claims are barred by the statute of frauds. Before reaching the merits of Reeves' claims we must first briefly discuss the law relating to the protection of ideas and the roles of novelty and originality.

### A. *Protection of Ideas*

■ The law pertaining to the protection of ideas must reconcile the public's interest in access to new ideas with the perceived injustice of permitting some to exploit commercially the ideas of others. *See* 3 David Nimmer, *Nimmer on Copyright* § 16.01, at 16–2 to 16–3 (1994). Federal law addresses the protection of new inventions and the expression of ideas. Federal patent law protects inventors of novel, nonobvious, and useful inventions by excluding others from "making, using, or selling the invention" for a period of seventeen years. *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 150, 109 S.Ct. 971, 977, 103 L.Ed.2d 118 (1989). Federal copyright law protects an individual's tangible *expression* of an idea, but not the intangible idea itself. 17 U.S.C. § 102(b) (1988). Copyright law creates a monopoly for the author that allows him or her to benefit economically from the author's creative efforts. It does not create a monopoly on the idea from which the expression originates; the idea remains available for all to use. Nimmer, *supra*, § 16.01, at 16–2 to 16–3. Reeves' claims do not fall under these federal protections because his idea is not a new invention, nor is it expressed in a copyrighted work. Nevertheless, federal law is not the only protection available to individuals and their ideas.

■ Creating a middle ground between no protection and the legal monopolies created by patent and copyright law, courts have protected ideas under a variety of contract and contract-like theories. *See* Nimmer, *supra*, §§ 16.02–16.06 (discussing and compiling cases that have applied or rejected theories of property, express contract, implied contract, quasi-contract, and confidential relationships to protect ideas). These theories protect individuals who spend their time and energy developing ideas that may benefit others. It would be inequitable to prevent these individuals from obtaining legally enforceable compensation from those who voluntarily choose to benefit from the services of the "idea-person." *See* Nimmer, *supra*, § 16.01, at 16–3. The California Supreme Court expressed this concept in the following manner:

> Generally speaking, ideas are as free as the air and as speech and the senses, and as potent or weak, interesting or drab, as the experiences, philosophies, vocabularies, and other variables of the speaker and listener may combine to produce, to portray, or to comprehend. But there can be circumstances when neither air nor ideas may be acquired without cost. The diver who goes deep in the sea, even as the pilot who ascends high in the troposphere, knows full well that for life itself he, or someone on his behalf, must arrange for air (or its respiration-essential element, oxygen) to be specifically provided at the time and place of need. The theatrical producer likewise may be dependent for his business life on the procurement of ideas from other persons as well as the dressing up and portrayal of his self-conceptions; he may not find his own sufficient for survival.

*Desny v. Wilder*, 46 Cal.2d 715, 299 P.2d 257, 265 (1956). The scope of idea protection, although primarily raised in the entertainment field, is not limited to that industry; it may also apply to business and scientific ideas. *See* Nimmer, *supra* § 16.01 n. 7.

We have not had occasion to address these theories in the context of the protection of ideas.[4] In addressing each of Reeves' claims

---

**4.** In *Darling v. Standard Alaska Prod. Co.*, 818 P.2d 677 (Alaska 1991), *cert. denied*, 502 U.S.

1097, 112 S.Ct. 1176, 117 L.Ed.2d 421 (1992), we concluded that an inventor failed to establish

we must determine whether the special nature of ideas affects the application of traditional contract and contract-like claims. In making these determinations we are mindful of the competing policies of retaining the free exchange of ideas and compensating those who develop and market their ideas. On the one hand, protecting ideas by providing compensation to the author for their use or appropriation rewards the idea person and encourages the development of creative and intellectual ideas which will benefit humankind. On the other hand, protecting ideas also inevitably restricts their free use, potentially delaying or restricting the benefit any given idea might confer on society. *See* Nimmer, *supra,* § 16.01.

Reeves argues that requiring novelty and originality, as did the trial court, erroneously imports property theories into contract-based claims. He contends that so long as the parties bargained for the disclosure of the idea, the disclosure serves as consideration and the idea itself need not have the qualities of property. Alyeska argues that novelty and originality should be employed as limiting factors in idea cases because these cases are based on a theory of idea as intellectual property. Alyeska contends that in order to be protected, an idea must have "not been suggested to or known by the public at any prior time."

We find that the manner in which requirements such as novelty or originality are applied depends largely on which theory of recovery is pursued. Thus, we will address the parties' arguments concerning novelty as they apply to each of Reeves' theories of recovery.

### B. *Express Contract Claims*

Reeves argues that he and Alyeska entered into three different oral contracts: (1) a confidentiality or disclosure agreement by which Alyeska promised not to use Reeves' idea without his participation, if Reeves disclosed the idea;[5] (2) a lease agreement by which Alyeska promised to lease the turnout to Reeves in exchange for a percentage of the center's profits; and (3) a memorialization agreement by which Alyeska promised to commit the agreement to writing.

■ Alyeska argues that Reeves alleged a *single contract* which "consisted of an agreement to keep Reeves' idea confidential, an agreement to lease land and an agreement to reduce the terms of the prior agreement to writing." It contends that to allow Reeves to argue he had three independent contracts would be inconsistent with his position at summary judgment and should therefore be precluded on appeal.

We disagree with Alyeska's analysis. Reeves has consistently argued that there were three agreements. It is of minor importance that he sometimes refers to these agreements as "a single binding contract." If any of the alleged agreements possesses the necessary elements to form a contract, Reeves is entitled to seek damages for breach of that agreement. We must analyze the legal relationships created by the parties' words and actions rather than the semantic tags the parties attach to their arguments.[6] We consider each of the three alleged agree-

---

an unjust enrichment claim because he relied solely on federal patent protection. In that case we noted explicitly that the facts of the case did not raise questions concerning express contracts, quantum meruit, and promissory estoppel. *Id.* at 683 n. 13.

5. Reeves refers to this agreement as a "confidentiality agreement." However, Reeves argues that Alyeska not only promised to keep his idea confidential, but promised not to use the idea without Reeves' participation. To label this alleged agreement a "confidentiality agreement" tends to overlook the participation portion of Alyeska's promise. We will refer to the first alleged contract as the "disclosure" agreement.

6. We note that the terms "contract," "agreement," and "promise" sometimes are considered synonymous and at other times are considered terms of art with specific legal meanings. *Compare* Restatement (Second) of Contracts § 1, cmt. a (1979) (stating that "contract" is sometimes used as a synonym for "agreement" or "bargain") *with* Restatement (Second) of Contracts § 3 (defining "agreement" as "a manifestation of mutual assent on the part of two or more persons"). The manner in which Reeves used the terms "contract" and "agreement" indicates he used them as synonyms rather than terms of art.

ments in turn.[7] Before returning to a discussion of the protection of ideas, we must determine whether the statute of frauds, AS 09.25.010, defeats any of Reeves' claims.

### 1. *The Disclosure Agreement*

■ Reeves alleges that in exchange for the disclosure of his idea, Alyeska promised to keep the idea confidential and not to use the idea without entering into a contract with Reeves to implement the idea. Reeves' deposition testimony, when all inferences are taken in his favor, supports the existence of a disclosure agreement. Reeves testified that in his early conversations with Burke, he told Burke that he was in the tourism industry and had an idea that would help Alyeska. Reeves stated that Burke told him the idea "was between us." Reeves testified that he "didn't offer anything to Keith Burke until [Reeves] was told by [Burke] that we had a deal. This was between me and him, and this was going no place else." Reeves also testified that Burke had promised confidentiality and that Reeves believed that he and Burke had a "done deal."

Alyeska does not respond separately to Reeves' disclosure agreement claim. It instead argues that, notwithstanding Reeves' assertion there were three agreements,

Reeves actually alleged only one contract, which included a purported twenty-year lease agreement. It argues that the statute of frauds applies because the alleged agreement concerns a lease for a period longer than one year and because performance would not be completed within one year.[8]

■ We conclude that the statute of frauds does not apply to the alleged disclosure agreement. That alleged agreement was to be completed within one year. If Alyeska chose to implement the idea, it was to enter into a lease agreement with Reeves by the summer tourist season. Moreover, Reeves' disclosure to Alyeska constituted full performance of his side of the contract for disclosure. The statute of frauds consequently does not apply. AS 09.25.020(1); *See Carter v. Hoblit,* 755 P.2d 1084, 1088 (Alaska 1988) (holding statute of frauds did not bar claim because party fully performed his obligation under the agreement); *Blaustein v. Burton,* 9 Cal.App.3d 161, 88 Cal.Rptr. 319, 335 (1970).

### 2. *The Lease Agreement*

Reeves claims he had an oral contract with Alyeska to lease the turnout for twenty years. Reeves concedes that this agreement

---

**7.** Alyeska does not argue explicitly that Reeves' idea must be novel and original to be the subject of an express contract. However, some of the cases it cites indicate that an idea that is not novel may not be protected by an express contract. *See Downey v. General Foods Corp., 31 N.Y.2d 56, 334 N.Y.S.2d 874, 877, 286 N.E.2d 257, 259 (1972)* ("[W]hen one submits an idea to another ... no asserted agreement [may be] enforced, if the elements of novelty and originality are absent...."); *Garrido v. Burger King Corp., 558 So.2d 79, 84 (Fla.App.1990)* ("[T]he novelty requirement prevents a person from being able 'by contract [to] monopolize an idea that is common and general to the whole world.'") (quoting *Soule v. Bon Ami Co., 201 A.D. 794, 195 N.Y.S. 574, 575 (N.Y.App.Div.1922)).*

Reeves argues that novelty and originality should not be required in express contract cases. He argues that California has rejected those requirements in contract cases. *See Desny, 299 P.2d at 266* ("Even though the idea disclosed may be 'widely known and generally understood,' ... it may be protected by an express contract providing that it will be paid for regardless of its lack of novelty."). Reeves also notes that New York has recently moved away from requiring novelty in some express contract cases.

*See Apfel v. Prudential–Bache Securities, Inc., 81 N.Y.2d 470, 600 N.Y.S.2d 433, 436, 616 N.E.2d 1095, 1098 (1993)* (holding that novelty and originality were not required in cases involving disclosure of ideas in which there was a *post-disclosure* contract for the idea).

Because Reeves claims that the consideration he provided consisted of his services, not the idea itself, we need not determine whether a non-novel idea by itself may serve as consideration in an express contract.

**8.** AS 09.25.010, the statute of frauds, provides in pertinent part:

(a) In the following cases and under the following conditions an agreement, promise, or undertaking is unenforceable unless it or some note or memorandum of it is in writing and subscribed by the party charged or by an agent of that party:

(1) an agreement that by its terms is not to be performed within a year from the making of it;

....

(6) an agreement for leasing for a longer period than one year, or for the sale of real property....

falls within the scope of the statute of frauds because it was for a long-term lease that could not be performed within one year. AS 09.25.010(a)(1),(6). Reeves argues, however, that two exceptions to the statute of frauds apply: first, he performed fully his contract duties, and second, Alyeska should be estopped from asserting the statute of frauds.

■ Alaska recognizes an exception to the statute of frauds if "there has been full performance on one side accepted by the other in accordance with the contract." AS 09.25.020. Reeves first asserts that by revealing his idea and drafting and submitting the written proposal, he performed his side of the agreement, at least insofar as he could before Alyeska breached the agreement.

We disagree. Rather than looking to his duties under the alleged lease agreement, Reeves argues he performed by disclosing his idea. However, he previously argued that disclosing the idea was the consideration for the disclosure agreement. If the three agreements are to stand as separate contracts, as Reeves argues, his act of disclosing the idea cannot also serve as full performance of the lease agreement.

Submitting the written proposal does not constitute full performance either. Reeves submitted the proposal as a preparatory act for a possible future agreement. The proposal itself states, "*I propose to lease* from Alyeska...." (Emphasis added.) This language indicates that the parties had not yet entered into a lease agreement by the time the proposal was created. A reasonable juror could not conclude that submitting the proposal constituted performance of a future lease contract. Moreover, the alleged lease agreement imposed three specific duties on Reeves. As argued by Reeves, Alyeska was to grant Reeves access and lease the turnout to him for twenty years, allow him to construct and operate an information center, and allow him to sell merchandise and charge admission. Reeves states, "*In exchange,*

Reeves agreed (1) to pay Alyeska 10% of his gross receipts ... (2) explain the positive aspects of the pipeline to visitors ... and (3) commence in the summer of 1991." (Emphasis added.) Reeves did not perform or partially perform any of those duties. Thus, his full performance argument fails.

■ Reeves next contends that Alyeska should be estopped from asserting the statute of frauds. He argues that because it was Alyeska's duty to draft the contract, it should not be allowed to benefit from its failure to perform.

We have never specifically adopted a promissory estoppel exception to the statute of frauds. However, other jurisdictions recognize this exception.[9] It also is recognized in the Restatement (Second) of Contracts § 139 (1981), which states in part:

Enforcement by Virtue of Action in Reliance

(1) A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce the action or forbearance is enforceable notwithstanding the Statute of Frauds if injustice can be avoided only by enforcement of the promise. The remedy granted for breach is to be limited as justice requires.

The Restatement's second illustration of section 139 is based on *Alaska Airlines v. Stephenson,* 217 F.2d 295 (9th Cir.1954). *See* Restatement (Second) of Contracts § 139 Reporters Note (1981) (explaining that the second illustration to section 139 is based on *Stephenson* ). Reeves argues that his reliance on Alyeska's promise to prepare a draft and execute a written contract is comparable to the facts of *Stephenson.*

In *Stephenson,* an airline pilot had tenure rights that guaranteed his position following a six-month leave of absence. 217 F.2d at 296. He took leave to explore a job opportunity with Alaska Airlines and moved to Anchorage. *Id.* As the six months neared

9. *Allen M. Campbell Co. v. Virginia Metal Indus. Inc.,* 708 F.2d 930, 933–34 (4th Cir.1983); *MacEdward v. Northern Elec. Co.,* 595 F.2d 105, 109 (2d Cir.1979); *Kubin v. Miller,* 801 F.Supp. 1101, 1122 (S.D.N.Y.1992); *Hawaiian Trust Co. v. Cowan,* 4 Haw.App. 166, 663 P.2d 634, 637 (1983); *Levine v. Loma Corp.,* 661 S.W.2d 779, 781 (Tex.App.1983); *Klinke v. Famous Recipe Fried Chicken, Inc.,* 94 Wash.2d 255, 616 P.2d 644, 647–48 (1980); *Wamser v. Bamberger,* 101 Wis.2d 637, 305 N.W.2d 158, 160 (App.1981).

completion, he sought definite employment from Alaska Airlines. *Id.* Alaska Airlines orally agreed to employ him for two years and to put the employment agreement in writing. *Id.* at 297. However, Alaska Airlines never executed a written agreement and it fired Stephenson within one year. *Id.* In the subsequent breach of contract action, the court held that the airline could not assert the statute of frauds because Stephenson had detrimentally relied on the oral agreement to put the employment agreement into writing. *Id.* at 298. It stated that "[when one looks at the Restatement of Contracts] one must conclude that there was an intention to carry promissory estoppel (or call it what you will) into the statute of frauds if the additional factor of a promise to reduce the contract to writing is present." *Id.*

Reeves argues that he relied detrimentally on Alyeska to draw up the agreement by not hiring his own lawyer to draw it up, by revealing the idea, and by typing and submitting the written proposal.

We conclude that Reeves did not rely on Alyeska's promise to the extent necessary to prevent the application of the statute of frauds. Promissory estoppel requires a substantial change in position on the part of the promisee in reliance on the promise. *Zeman,* 699 P.2d at 1284. Although there is evidence of some change in position, Reeves' actions in reliance on Alyeska's promise to memorialize the agreement are insufficient to estop Alyeska from asserting the statute of frauds.

First, the idea was not disclosed in reliance on the alleged lease agreement; disclosure occurred before an oral lease agreement could have existed. Reeves has presented no evidence that Alyeska agreed to enter into a lease *before* Burke heard Reeves' idea. Therefore, although disclosing the idea

changed Reeves' position, the idea was not disclosed in reliance on the lease agreement or memorialization agreement. Second, Reeves did not materially change his position when he forwent hiring his own attorney to draft the document. Reeves has presented no evidence that Alyeska would have executed a written contract if Reeves had provided one. Third, Reeves could not have typed and submitted the written proposal in reliance on the alleged lease agreement because the proposal was submitted before the promise was made.

In the absence of any substantial change in position, the promissory estoppel exception to the statute of frauds does not apply. Reeves' claim based on an express contract for a lease was properly dismissed on summary judgment.

### 3. The Memorialization Agreement

Reeves argues that the agreement to memorialize the contract does not fall within the statute of frauds because performance was to be completed within one year. He argues that Alyeska promised to "memorialize the agreement and prepare the documents for execution." Assuming that Alyeska's alleged promise to prepare the documents included the related promise to execute the documents, the statute of frauds applies.[10]

■ Legal authorities agree generally that when parties promise to execute a written memorandum of a contract, if the underlying contract falls under the statute of frauds, the promise to execute the written contract also falls under the statute of frauds. *See, e.g., Orthomet, Inc. v. A.B. Medical, Inc.,* 990 F.2d 387, 391 (8th Cir. 1993) ("[A]n agreement to subsequently enter into a written contract must also satisfy the statute of frauds."); 2 Arthur L. Corbin, *Corbin on Contracts* § 283, at 31–34 (1950);[11]

---

10. It is a question of fact whether Alyeska's alleged promise to memorialize the agreement included a promise to execute. A reasonable juror could find from Reeves' account of Burke's language that the promise to draw up the agreement included a promise to execute.

11. Professor Corbin's comments are particularly forceful:

If the contract to be executed is within the statute, the preliminary oral contract is also held to be within the statute. No action for damages will lie for its breach, nor in the absence of "part performance" will a court of equity enforce it specifically or otherwise. A refusal to execute the promised memorandum is not fraud. There are a few cases, hardly reconcilable with the majority of decisions in

3 Samuel Williston, *Williston on Contracts* § 524A, 691–92 (1960).[12]

We agree with the weight of authority and hold that an oral promise to execute a written contract, where a written contract is necessary to satisfy the statute of frauds, must itself satisfy the statute of frauds. To hold otherwise would allow the statute of frauds to be circumvented merely by asserting that the parties orally agreed to put the contract in writing.

### C. Implied–in–Fact Contract

■ The trial court's opinion did not address whether Reeves established a contract implied-in-fact.[13] Reeves argues that he "submitted uncontroverted evidence sufficient to find as a matter of law that Alyeska's actions established a contract implied in fact." We conclude that Alyeska failed to carry its burden of showing that it is entitled to judgment as a matter of law on this claim. *Zeman,* 699 P.2d at 1280.

■ Reeves has made out a prima facie case for an implied contract. We have held that an implied-in-fact contract, like an express contract, is based on the intentions of the parties. "It arises where the court finds from the surrounding facts and circumstances that the parties intended to make a contract but failed to articulate their promises and the court merely implies what it feels the parties really intended." *Martens v. Metzgar,* 524 P.2d 666, 672 (Alaska 1974)

which equity has given relief partly on the ground that the promisor promised to execute a sufficient memorandum; but there was other evidence of "fraud" or there was some sort of "part performance."
Corbin, *supra* § 283, at 31–34.

**12.** Professor Williston takes a more moderate approach. He states that "[t]echnically, the agreement to reduce the main contract to writing is not within the Statute." 3 Williston, *supra* § 524A, at 691. Williston nonetheless recognizes that, "[a]s a practical matter, ... the enforcement of such an agreement is tantamount to taking the main contract out of the Statute, ... and is, therefore, considered by some courts as 'opposed to the spirit of the act.'" *Id.* at 692.

**13.** The trial court did not mention Reeves' third cause of action for breach of implied-in-fact contract in the footnote listing the issues its opinion

(quoting *Hill v. Waxberg,* 237 F.2d 936, 939 (9th Cir.1956)).

In *Aliotti v. R. Dakin & Co.,* 831 F.2d 898, 902 (9th Cir.1987), the court listed the requirements for demonstrating an implied-in-fact contract under California law:

[O]ne must show: that he or she prepared the work; that he or she disclosed the work to the offeree for sale; under all circumstances attending disclosure it can be concluded that the offeree voluntarily accepted the disclosure knowing the conditions on which it was tendered (i.e., the offeree must have the opportunity to reject the attempted disclosure if the conditions were unacceptable); and the reasonable value of the work.

■ There are three primary factual scenarios under which ideas may be submitted to another. *See* Nimmer, *supra* § 16.05. The first involves an unsolicited submission that is involuntarily received. *Id.* at 16–33. The idea is submitted without warning; it is transmitted before the recipient has taken any action which would indicate a promise to pay for the submission. *Id.* at 16–33 to 16–34. Under this scenario, a contract will not be implied. *Desny,* 299 P.2d at 270; Nimmer, *supra,* § 16.05[B], at 16–34.

■ The second involves an unsolicited submission that is voluntarily received. Nimmer, *supra,* § 16.05[C], at 16–36. In this situation, the idea person typically gives the recipient advance warning that an idea is to be disclosed; the recipient has an opportu-

would address. A review of Reeves' brief in opposition to summary judgment reveals that Reeves did not explicitly argue this cause of action. On appeal, however, Reeves specifically argues this theory of recovery and Alyeska responds to it. Because Reeves' implied-in-fact contract claim does not require the development of new facts and is closely related to the express contract claim, and because Alyeska does not claim waiver, we will consider Reeves' argument on appeal. *See Sea Lion Corp.,* 787 P.2d at 115 (stating that new arguments raised on appeal may be considered if they are "1) not dependent on any new or controverted facts; 2) closely related to the appellant's trial court arguments; and 3) could have been gleaned from the pleadings").

nity to stop the disclosure, but through inaction allows the idea to be disclosed. *Id.* at 16–36 to 16–37. Under California law, if the recipient at the time of disclosure understands that the idea person expects to be paid for the disclosure of the idea, and does not attempt to stop the disclosure, inaction may be seen as consent to a contract. *Desny,* 299 P.2d at 267; *Donahue v. Ziv Television Programs, Inc.,* 245 Cal.App.2d 593, 54 Cal.Rptr. 130, 139 (1966).

This view has been criticized as unfairly placing a duty on the recipient to take active measures to stop the submission. Nimmer, *supra* § 16.05[C], at 16–38. The critics argue that inaction generally should not be considered an expression of consent to a contract. *Id.*

We believe that a contract should not be implied under this scenario. An implied-in-fact contract is based on circumstances that demonstrate that the parties intended to form a contract but failed to articulate their promises. *Martens,* 524 P.2d at 672. Only under exceptional circumstances would inaction demonstrate an intent to enter a contract.[14]

■ The third scenario involves a solicited submission. Nimmer, *supra* § 16.05[D], at 16–40. Here, a request by the recipient for disclosure of the idea usually implies a promise to pay for the idea if the recipient uses it. *Desny,* 299 P.2d at 267; Nimmer, *supra* § 16.05[D] at 16–40. Nimmer states,

> The element of solicitation of plaintiff's idea by defendant is therefore of great importance in establishing an implied contract. If defendant makes such a request, even if he attempts to frame the request in ambiguous or exculpatory language, most

courts will nevertheless imply a promise to pay if the idea is used.

*Id.* at 16–40 to 16–41.

■ Reeves argues that Alyeska solicited his idea. He alleges that Burke asked him what the idea was, and later requested a written proposal. He contends that the request and Alyeska's later use of the idea created an implied contract for payment. These allegations are sufficient to survive summary judgment. A reasonable fact-finder could determine that Burke's actions implied a promise to pay for the disclosure of Reeves' idea. A fact-finder could also determine that Reeves volunteered the idea before Burke took any affirmative action that would indicate an agreement to pay for the disclosure. These possible conclusions present genuine issues of material fact.

■ Relying largely on cases from New York, Alyeska argues that novelty and originality should be required in an implied-in-fact claim. Reeves responds that we should follow California's example and not require novelty as an essential element of this sort of claim.

Idea-based claims arise most frequently in the entertainment centers of New York and California, but New York requires novelty, whereas California does not.[15] *Compare Murray v. National Broadcasting Co.,* 844 F.2d 988, 993–94 (2d Cir.), *cert. denied,* 488 U.S. 955, 109 S.Ct. 391, 102 L.Ed.2d 380 (1988), *with Donahue,* 54 Cal.Rptr. at 140.

We prefer the California approach. An idea may be valuable to the recipient merely because of its timing or the manner in which it is presented. *Cf. Donahue,* 54 Cal.Rptr. at 140. In *Chandler v. Roach,* 156 Cal.App.2d

---

**14.** We recognize the possibility of a rare case in which inaction could express intent to form a contract. For example, a contract would be implied if the parties' history of dealings demonstrated that they had entered into similar contracts in the past, or if it were proven in a particular field or industry that a recipient's silence constitutes agreement to pay for an idea upon use.

**15.** Reeves argues that *Apfel v. Prudential–Bache,* 81 N.Y.2d 470, 600 N.Y.S.2d 433, 436, 616 N.E.2d 1095, 1098 (1993), a recent New York case, has abandoned the requirements of novelty

and originality. In *Apfel,* the court held that parties may enter a contract, after disclosure of the idea, without a requirement of novelty or originality. *Id.* However, *Apfel* does not necessarily eliminate a novelty requirement in idea cases. The court distinguished cases in which "the buyer and seller contract for *disclosure* of the idea with payment based on use, but no separate post-disclosure contract for use of the ideas has been made." *Id.* New York law would appear to require an express post-disclosure contract in order to succeed on a contract claim for a non-novel idea.

435, 319 P.2d 776 (1957), the court stated that "the fact that the [recipient of the idea] may later determine, with a little thinking, that he could have had the same ideas and could thereby have saved considerable money for himself, is no defense against the claim of the [idea person]. This is so even though the material to be purchased is abstract and unprotected material." *Id.* 319 P.2d at 781.

Implied-in-fact contracts are closely related to express contracts. Each requires the parties to form an intent to enter into a contract. It is ordinarily not the court's role to evaluate the adequacy of the consideration agreed upon by the parties. *Carroll v. Lee*, 148 Ariz. 10, 712 P.2d 923, 926–27 (1986). The bargain should be left in the hands of the parties. If parties voluntarily choose to bargain for an individual's services in disclosing or developing a non-novel or unoriginal idea, they have the power to do so. The *Desny* court analogized the services of a writer to the services of a doctor or lawyer and determined there was little difference; each may provide a product that is not novel or original. *Desny*, 299 P.2d at 266. It held that it would not impose an additional requirement of novelty on the work. Although Reeves is not a writer, his ideas are entitled to no less protection than those of writers, doctors, or lawyers. Therefore, Reeves should be given the opportunity to prove the existence of an implied-in-fact contract for disclosure of his idea.

### D. *Promissory Estoppel*

Reeves claims that the trial court erred in granting summary judgment to Alyeska on his promissory estoppel claim. He argues that there were genuine fact questions. Alyeska argues that Reeves presented no evidence of detrimental reliance.

Under Alaska law, a promissory estoppel claim has four requirements:

1) The action induced amounts to a substantial change of position;

2) it was either actually foreseen or reasonably foreseeable by the promisor;

3) an actual promise was made and itself induced the action or forbearance in reliance thereon; and

4) enforcement is necessary in the interest of justice.

*Zeman*, 699 P.2d at 1284. Reference to a set formula does not determine whether particular promises and actions satisfy the requirements of promissory estoppel; all circumstances are to be considered. *Id.;* 1A Corbin, *supra*, § 200, at 216.

Reeves contends that in reliance on promises made by Alyeska in context of separate disclosure, lease, and memorialization agreements, he took two actions that changed his position: he disclosed the idea, and he failed to hire an attorney to draft the contract. Although forbearance may sometimes be considered an action that changes one's position, *Zeman*, 699 P.2d at 1284, Reeves' failure to hire an attorney did not amount to a substantial change of position. As noted above, even if Reeves had presented a written contract to Alyeska, no evidence permits an inference Alyeska would have executed it.

By disclosing his idea, however, Reeves substantially changed his position. Once he disclosed the idea, Reeves' ability to bargain for terms was significantly reduced. It was reasonably foreseeable that a promise of confidentiality and a promise to allow Reeves to participate in any use of the idea would induce disclosure. There was evidence permitting an inference Alyeska's alleged promises induced the disclosure. Consequently, genuine fact disputes exist regarding the first three requirements for promissory estoppel.

The fourth requirement, that enforcement is necessary in the interest of justice, presents fact questions that ordinarily should not be decided on summary judgment. *State v. First Nat'l Bank of Ketchikan*, 629 P.2d 78, 82 n. 4 (Alaska 1981). The record demonstrates that this issue presents fact questions. It is therefore necessary to remand Reeves' promissory estoppel claim based on his disclosure of the idea in reliance on promises of confidentiality and participation.[16]

---

**16.** Alyeska argues that a promissory estoppel claim based on an idea requires a showing of novelty. However, Alyeska does not explain why novelty is required for a promissory estoppel

### E. Quasi–Contract Claim

■ Reeves argues that Alyeska was unjustly enriched because it solicited and received Reeves' services, ideas, and opinions without compensating Reeves. He argues that the trial court erred in granting summary judgment to Alyeska on his quasi-contract cause of action.[17]

■ We have required the following three elements for a quasi-contract claim:

1) a benefit conferred upon the defendant by the plaintiff;

2) appreciation by the defendant of such benefit; and

3) acceptance and retention by the defendant of such benefit under such circumstances that it would be inequitable for him to retain it without paying the value thereof.

*Alaska Sales and Serv., Inc. v. Millet,* 735 P.2d 743, 746 (Alaska 1987). Quasi-contracts are "judicially-created obligations to do justice." *Id.* "Consequently, the obligation to make restitution that arises in quasi-contract is not based upon any agreement between the parties, objective or subjective." *Id.*

The trial court understood Reeves to be arguing that his idea was a property right that was stolen by Alyeska. Reeves, however, argues that "Alyeska took Reeves' concept, proposal *and services* without any payment to Reeves." (Emphasis added.) Reeves' quasi-contract claims must be divided into two categories. His claim that Alyeska appropriated his idea for a visitor center is necessarily a property-based claim that seeks recovery for the value of the idea itself; Reeves seeks a recovery based on "his" idea.

His claims that Alyeska benefitted from his proposal and services, however, do not necessarily rely on the visitor center idea being property; these claims are based on his services of disclosing and drafting the proposal. The property and non-property claims are treated differently.

■ An idea is usually not regarded as property because our concept of property implies something that can be owned and possessed to the exclusion of others. *Desny,* 299 P.2d at 265; Nimmer, *supra,* § 16.02, at 16–5. To protect an idea under a property theory requires that the idea possess property-like traits. Courts consider the elements of novelty or originality necessary for a claim of "ownership" in an idea or concept. *See Murray,* 844 F.2d at 993–94, *cert. denied,* 488 U.S. 955, 109 S.Ct. 391, 102 L.Ed.2d 380 (1988); *Fink v. Goodson–Todman Enterprises,* 9 Cal.App.3d 996, 88 Cal.Rptr. 679, 690 (1970); *Garrido v. Burger King Corp.,* 558 So.2d 79, 84 (Fla.App.1990); *Eenkhoorn v. New York Telephone Co.,* 148 Misc.2d 999, 568 N.Y.S.2d 677, 678 (N.Y.Sup.1990); Nimmer, *supra,* § 16.03[B]. These elements distinguish protectable ideas from ordinary ideas that are freely available for others to use. It is the element of originality or novelty that lends value to the idea itself.

■ If the idea is not distinguished in this manner, its use cannot satisfy the requirements of a quasi-contract claim. The idea, even if beneficial to the defendant, cannot be conferred if the plaintiff has no right of possession. With no right of possession, the idea cannot be said to have been con-

claim and none of the cases it cites addresses promissory estoppel claims. We therefore treat this argument as abandoned. *Gates v. City of Tenakee Springs,* 822 P.2d 455, 460 (Alaska 1991).

Reeves also argues promissory estoppel applies because he was induced to disclose his idea in reliance on promises to lease or memorialize the contract. We reject that argument because neither alleged promise could have induced disclosure. An agreement to lease necessarily assumes that Alyeska was aware of the visitor center idea, meaning that disclosure must have preceded the promise. Similarly, there is no evidence the parties entered into a memorialization agreement before Reeves disclosed the idea.

17. The concepts of quasi-contract, unjust enrichment, contract implied in law, and quantum meruit are very similar and interrelated. *Alaska Sales & Service, Inc. v. Millet,* 735 P.2d 743, 746 n. 6 (Alaska 1987). Unjust enrichment is not itself a theory of recovery. "Rather, it is a prerequisite for the enforcement of the doctrine of restitution; that is, if there is no unjust enrichment, there is no basis for restitution." *Id.* at 746. Restitution also is not a cause of action; it is a remedy for various causes of action. *Id.* Quasi-contract is one of the causes of action Reeves has pursued.

ferred by the plaintiff.[18] Nimmer, *supra*, § 16.03[B]. Despite Reeves' protestations, the idea of establishing a visitor center near the pipeline is neither original nor novel.[19]

Nevertheless, not all of Reeves' quasi-contract claims require that his idea be considered property and consequently novel or original. Reeves argues that Alyeska was unjustly enriched "by Reeves' efforts on its behalf, not merely on the 'concept that [Reeves'] idea was intellectual property.'" Therefore, we must analyze whether the parties' transactions give rise to a quasi-contract.

The facts alleged by Reeves demonstrate that Burke specifically asked Reeves to draw up a proposal and that Alyeska was going to "do this deal." There is also evidence Reeves was familiar with the Fairbanks summer tourist industry and had special expertise in that area. These facts present a genuine issue of fact as to whether Alyeska benefited from Reeves' experience or his written plan. Thus, there is a question of fact whether Reeves' idea had value to Alyeska in its timing or in how it was presented, rather than in its novelty or originality. Reeves' endorsement of the idea, in combination with his experience in the Fairbanks tourism industry, may have also been valuable to Alyeska. The fact that Alyeska rejected a similar idea in 1987 may indicate that some feature of Reeves' plan or presentation caused Alyeska to go forward with a visitor center. If Reeves' services unjustly

enriched Alyeska, he should be compensated for the value of those services.[20]

### F. Reeves' Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing

The trial court granted summary judgment to Alyeska on Reeves' claim for breach of the implied covenant of good faith and fair dealing. It stated that although the covenant of good faith and fair dealing is implied in every contract governed by Alaska law, it concluded that this claim must fail because it believed that no contract existed. *See Guin v. Ha*, 591 P.2d 1281, 1291 (Alaska 1979) (recognizing the covenant of good faith and fair dealing implied in all contracts); *O.K. Lumber Co. v. Providence Washington Ins. Co.*, 759 P.2d 523, 526 (Alaska 1988) (declining to recognize a tort duty of good faith and fair dealing independent of the contractual relationship).[21] Reeves argues that because there is evidence of three distinct contracts, the claim of breach of the covenant of good faith and fair dealing raises a factual question for the jury. *See* 3A Corbin, *supra* § 654B, at 96 (1960 & supp. 1994) ("Good faith always involves questions of fact."). Because we hold that there is evidence of a contract for disclosure of the idea, we must remand Reeves' claim for good faith and fair dealing in regard to that agreement.

### G. Reeves' Tort Claims

The trial court granted summary judgment to Alyeska on Reeves' tort claims of fraud

---

18. The court correctly granted summary judgment on Reeves' conversion claim for the same reason. If an idea is not considered property, it cannot be converted. *Pearson v. Dodd*, 410 F.2d 701, 707 (D.C.Cir.), *cert. denied*, 395 U.S. 947, 89 S.Ct. 2021, 23 L.Ed.2d 465 (1969); *Thompson v. Mobil Producing Co.*, 163 F.Supp. 402, 404 (D.Mont.1958).

19. There may be some question about whether the idea was novel to Burke because he had not heard that in 1987 Alyeska Pipeline Club North had suggested the same idea. Reeves argues that the idea was novel as to Alyeska because Burke did not know of the rejected 1987 proposal until after he contracted with Reeves. The visitor center idea was not novel to Alyeska. It was aware of the 1987 visitor center proposal, and it already operated a visitor center in Valdez. Burke's ignorance of the specific 1987 proposal does not make the visitor center idea novel.

20. The value of Reeves' services presents fact issues that should be determined by the fact-finder.

21. In *State, DNR v. Transamerica Premier Ins. Co.*, 856 P.2d 766, 774 (Alaska 1993), this court distinguished insurance contracts as an exceptional class of contracts, which created a special relationship between insurer and insured, and explained that this unusual relationship justified the creation of an action in tort for breach of the covenant of good faith and fair dealing. In contrast to this, we held that, though all contracts include an implied covenant of good faith and fair dealing, in ordinary commercial contracts the claim for violation of this covenant sounds only in contract.

and negligent misrepresentation because Reeves cited no evidence of detrimental reliance. Because Reeves presented evidence of detrimental reliance in regard to disclosing the idea, we remand the fraud and negligent misrepresentation claims which are based on a disclosure agreement. However, the trial court did not err in dismissing the tort claims that are dependent on the lease or memorialization agreements.

### H. *Discovery of Burke's Daily Calendar*

Reeves argues that Alyeska should have been compelled to produce an unredacted copy of Burke's daily calendar.[22] During discovery, Reeves requested "[a]ny desk calendars or other calendars, diaries, or notes that refer or relate to any meeting or discussion with plaintiff." Alyeska did not object to the request and responded by producing a redacted version of Burke's daily calendar. Alyeska intended the redactions to eliminate any materials "that were not requested and had no relevancy to the pending action." The trial court denied Reeves' motion to compel because it concluded that Alyeska's interpretation of the request was reasonable. We conclude that the court did not abuse its discretion in finding that Alyeska's response was reasonable.

### IV. *CONCLUSION*

For the reasons stated above, we REVERSE that part of the summary judgment entered for Alyeska on Reeves' express contract, implied contract, promissory estoppel, quasi-contract, breach of implied covenant of good faith and fair dealing, and related tort claims based on the alleged disclosure agreement, and REMAND to the trial court for further proceedings consistent with this opinion. We AFFIRM the summary judgment entered for Alyeska on the remainder of Reeves' claims, including those based on the alleged lease and memorialization agreements. We AFFIRM the trial court's deci-

---

**22.** This court will review a discovery order for abuse of discretion. *R.E. v. State,* 878 P.2d 1341,

sion not to compel production of an unredacted version of Burke's daily calendar.